UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

FREEDOM FROM RELIGION FOUNDATION, INC,

    Plaintiff,

v.                                                       Case No.: 08-cv-1105

MANITOWOC COUNTY, WISCONSIN
BOB ZIEGLEBAUER, Manitowoc County Executive,
And JEFFREY BEYER, Manitowoc County
Public Works Director,

    Defendants.
_____

### RESPONSE TO PLAINTIFF'S MOTIONS TO MODIFY THE SCHEDULING ORDER AND FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT ON BEHALF OF MANITOWOC COUNTY, BOB ZIEGLEBAUER AND JEFFREY BEYER
_____

Manitowoc County, Bob Zieglebauer and Jeffrey Beyer, by their attorneys, Crivello Carlson, S.C., submit the following Brief in Response to Plaintiff's Motions to Modify the Scheduling Order and for Leave to File a Supplemental Complaint.

### FACTUAL BACKGROUND

Freedom From Religion Foundation Inc. ("FFRF") commenced this lawsuit in December 2008 alleging that the Defendants violated the Establishment Clause of the First Amendment of the United States Constitution in 42 U.S.C. § 1983 by allowing the public display of a Nativity scene on the Manitowoc County Courthouse lawn by the Manitowoc County Catholic Women's Club. FFRF sought a declaration that such actions violated the Establishment Clause, for an order enjoining the Defendants from promoting, advancing, or endorsing the establishment of religion by such public displays and for a judgment awarding such further relief as the Court deems just and equitable

including costs and attorney fees.

Both parties recently moved for Summary Judgment. Defendants incorporate their briefs and affidavits to the extent they touch upon the issues presented here. As the briefing shows, the parties engaged in minimal discovery. Plaintiffs' Rule 26(a)(1) Disclosures contain minimal information regarding the basis for their claims under the Establishment Clause. **See Exh. A to Aff. of Bitar in Support of Defendants' Motion for Summary Judgment**. Likewise, FFRF sought basic information about the history and background of allowing the Nativity display and any policies and procedures whatsoever regarding displays or activities on the Courthouse grounds. **See Exh. C and D. to Aff. of Kratz in Support of Plaintiff's Motion for Summary Judgment**. The County had only unrelated policies governing employee use of the courthouse and after-hours use of the courthouse, but no written policies on use of the courthouse grounds.

In September 2009, the Manitowoc County Board of Supervisors passed a Resolution adopting the Courthouse Policies and Procedures for Courthouse Grounds Use ("Policy"). The Resolution stated that the County Courthouse served as a seat of County government for several governmental uses and is on the National Register of Historic Places. The Resolution also stated that the Court is involved in this litigation and that "the public works committee believes that it is in the county's interest to adopt written policies and procedures regarding use of the courthouse grounds in order to avoid or minimize the potential for future litigation …" **See Exhibit A to Proposed Supplemental Complaint**. The Policy itself identifies these governmental concerns as well as avoiding interference with governmental business, maintaining decorum, avoiding disruption, aesthetics (i.e., clean-up) and protecting the public health, safety and welfare. **See Exhibit B to Proposed Supplemental Complaint (Policy p. 1, 2, 6)**.

The Policies and Procedures for Courthouse Ground Use contain a number of provisions,

including: Use; General Polices; Permit Applications; Fees; Permit Holder Responsibilities; Insurance and Liability; Personnel and Security; Equipment, Facilities, and Safety; Specific Prohibitions; Vehicles And Parking; Weddings; Reservation Of Rights; and Questions. Along with the polices and procedures, the Manitowoc County Board of Supervisors also adopted an "Application for Grounds Use Permit" and a "Grounds Use Permit." **See Exhibit B to Proposed Supplemental Complaint**. "The decision to issue a permit for use of the courthouse grounds will be made on a nondiscretionary basis and will not be based on the religious or political content of the activity, display, or exhibit." **Policy p. 1**. The policy includes "General Policies" for decorum, security, display location and areas, availability, size limits, duration, number and cost, among other things. **Policy p. 2-3**. A person who wishes to use the courthouse grounds must apply for a permit to be reviewed by the Public Works Committee. **Policy p. 3**. "Display areas are available on a first come, first serve basis." **Policy p. 2**. The policy requires the payment of a fee, responsibilities of the permit holder and insurance and liability provisions. **Policy p. 4-5**. If a permit is denied, the Notice of Denial will state the reasons and the applicant may appeal within 10 days to the County Board's Executive Committee, which will make a final decision within 7 days. **Policy p. 3, 4**. Finally, in the "Reservation of Rights," the policy states that "[t]he issuance of a permit does not constitute approval or endorsement of an activity or event, of the group conduct the activity or event, or of the group's purpose." **Policy p. 9**.

The County Defendants included the new Policy in their Motion for Summary Judgment as it pertained to issues of mootness, but have not relied on the Policy as it pertains to the merits of the Establishment Clause claim. This information showed the Court that the County was attempting to address any future concerns similar to those alleged in this case. The Courthouse Grounds Use Policy, by itself, does not address the allegations in this case. FFRF seems to recognize this:

"regardless of the Policies and Procedures enacted by the Manitowoc County Board, a stand-alone nativity scene displayed at the seat of County government conveys a message of government endorsement of Christianity." **See Proposed Supplemental Complaint, ¶ 25**. Thus, even FFRF recognizes that the primarily and exclusive issue here remains to be the Establishment Clause challenge as alleged in its Complaint and as briefed by the parties on summary judgment.

Whereas the original Complaint criticized the County for having "phantom regulations," FFRF's proposed Supplemental Complaint now challenges the County for requiring "[a]nyone wishing to hold an event or erect an unattended display is required to seek prior County approval under these new Policies and Procedures." **Proposed Supplemental Complaint ¶ 4**. Although the Proposed Supplemental Complaint does not state that the new polices and procedures have been applied to FFRF or any of its members, FFRF nevertheless alleges the application process, the financial obligations, and the standards violate the First Amendment. *Id***. ¶ 6-18**.

The Proposed Supplemental Complaint seeks a declaration that the new Courthouse Grounds Use Policy violates the First Amendment of the United States Constitution, specifically an unconstitutional abridgment of the Free Speech Clause. **See Proposed Supplemental Complaint, ¶ 16; Prayer ¶ A**. The Proposed Supplemental Complaint also seeks an Order enjoining "the Defendants from implementing the 'Policies and Procedures' governing Courthouse Use Grounds." *Id***. at Prayer, ¶ B**.

## STANDARD OF REVIEW

Under Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend his pleading after a responsive pleading is served only by leave of court or by written consent of the adverse party. **Fed. R. Civ. P. 15(a)**. The standards of Rule 15(a) state: "leave shall be freely given when justice so requires." *Id*. However, "such a motion is always made to the sound

4
Case 1:08-cv-01105-WCG    Filed 11/02/09    Page 4 of 19    Document 45

discretion of the district court and the court may deny leave to amend where the proposed amendment fails to allege facts which would support a valid theory of liability, or where the party moving to amend has not shown that the proposed amendment has substantial merit." ***Verhein v. South Bend Lathe, Inc.*, 598 F.2d 1061, 1063 (7th Cir. 1979)**. "The liberal amendment rules under Rule 15(a) do not require the courts to indulge in futile gestures." ***Glick v. Koenig,* 766 F.2d 265, 268 (7th Cir.1985)**. "A district court does not abuse its discretion in denying leave to amend if the proposed repleading would be futile…." ***Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994)**, *citing*, ***DeSalle v. Wright,* 969 F.2d 273, 278 (7th Cir.1992)**. "Futile repleadings" include "restating the same facts using different language, reasserting claims previously determined, failing to state a valid theory of liability, and the inability to survive a motion to dismiss." ***Id.*** (citations omitted).

## LEGAL ANALYSIS

### I. DENIAL OF FFRF'S MOTIONS ARE WARRANTED BECAUSE THEY WOULD NOT SURVIVE A DISPOSITIVE MOTION UNDER NOTICE PLEADING STANDARDS.

To survive a motion to dismiss for failure to state a claim, a complaint must contain factual allegations sufficient to "raise a right to relief above the speculative level." ***Bell Atl. Corp. v. Twombly*, 550 U. S. 544, 127 S. Ct. 1955, 1965 (2007)**. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." ***Id*. at 1964-65** (quoting **Fed. R. Civ. P. 8(a)(2)**. The Supreme Court has explained that a plaintiff must "nudge" its claims "across the line from conceivable to plausible" in order to survive a motion to dismiss. ***Id*. at 1974**. The complaint must contain "sufficient factual matter, accepted

as true, to state a claim to relief that is plausible on its face." ***Ashcroft v. Iqbal,*** **___ U.S. ___, 129 S.Ct. 1937, 1949 (2009)**. "Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." ***The Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)**.

Here, the proposed Supplemental Complaint fails to rise about the speculative level. FFRF has not identified a particular cause of action under the First Amendment with any specificity beyond mere labels and conclusions. Nor has it alleged that it applied for a permit under the Courthouse Use Policy and that it was denied a permit. Indeed, FFRF talks about changes in facts and circumstances, **FFRF's Brief in Support of Motion p. 6**, but the proposed Supplemental Complaint does not identify the facts and circumstances concerning FFRF's activities. The Declaration of Kratz is silent on these points. Without any such factual allegations, FFRF's proposed Free Speech claim amounts to nothing more than mere speculation, which under *Twombly* is insufficient to defeat a motion to dismiss.

## II. DENIAL OF FFRF'S MOTIONS ARE WARRANTED BECAUSE THEY WOULD NOT SURVIVE A DISPOSITIVE MOTION FOR LACK OF STANDING.

The proposed Supplemental Complaint does not allege that FFRF has applied for a permit, and been rejected, under the Courthouse Use Policy.

Legal standing begins with consideration of constitutional standing under Article III. With respect to an organization, it has standing if (1) at least one of its members would otherwise have standing; (2) the interest at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's

participation in the lawsuit. **See** *Friends of the Earth Inc. v. Laidlaw Env'L Servs. Inc.*, **528 U.S. 167, 181 (2000)**. An individual must satisfy three requirements: (1) an individual must have suffered an "injury in fact" that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action; and (3) it must be likely, not just speculative, that a favorable decision will redress the injury. **See** *Lujan v. Defenders of Wildlife,* **504 U.S. 555, 560-561 (1992)**. To ignore these minimum requirements "would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of the concerned bystanders.'" *Valley Forge Christian Coll. v. Americans United for Sep. of Church and State,* **454 U.S. 464, 473 (1982)**.

Plaintiffs must also satisfy prudential standing which encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, **468 U.S. 737, 751 (1984)**. Prudential standing requirements preclude litigation in federal court "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens," or where instead of litigating "his own legal rights and interests," the plaintiff instead purports to "rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* **422 U.S. 490, 499 (1975)**.

When no member of the association, as here, has suffered an injury in fact, the minimum requirements are not met. There is no allegation that anyone has applied and been turned down under the Policy. FFRF has failed to allege an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth,* **528 U.S. at 180; see also** *Moose Lodge No. 107 v. Irvis***, 407 U.S. 163, 166-167 (1972)** (holding that the plaintiff

lacked standing to challenge a club's membership policy "since he never sought to become a member").

FFRF cannot argue there is an exception. In First Amendment cases, plaintiffs may challenge a provision's constitutionality as applied to other parties "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. American Booksellers Ass'n,* **484 U.S. 383, 392-93 (1988)**.

This exception does not apply for two reasons. First, it is an exception to prudential standing, not an exception to the injury-in-fact requirement of Article III standing. *See American Booksellers,* **484 U.S. at 392-93** (holding that "[t]o bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some threatened or actual injury resulting from the putatively illegal action.")**;** ***Secretary of State v. Joseph H. Munson, Co.,* 467 U.S. 947, 956-57, 958 (1984)** ("The crucial issues [for overbreadth standing] are whether [the plaintiff] satisfies the requirement of injury-in-fact, and whether [the plaintiff] can be expected satisfactorily to frame the issues in the case."). A *jus tertii* plaintiff is obligated as an initial matter to allege a distinct and palpable injury as required by Article III. *Warth,* **422 U.S. at 501**.

Second, FFRF can only raise the rights of others in an overbreadth challenge if there is "a realistic danger" that the challenged rule "will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* **466 U.S. 789, 801 (1984)**. FFRF has not alleged a realistic danger that the new policy *significantly* compromises someone's rights. Even if it could, that

may not be enough. When the plaintiff alleges that a law invests the government with discretion to discriminate on the basis of viewpoint, "such a 'facial challenge will not succeed unless the statute is "substantially" overbroad,' by which we mean that 'a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications.'" ***Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 619 (1998)**. The overbreadth doctrine is "strong medicine" to be used "sparingly" and only when the overbreadth is not only "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." ***Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973)** ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute."). FFRF has not alleged that the Policy has real and substantially sweeping unconstitutional applications. Indeed, it has not alleged any unconstitutional application concerning its own organization and membership. Given the insufficient pleading described in Section I above, it is also difficult to determine whether FFRF grounds its standing in terms of seasonal displays, other temporary displays, or permanent monuments.

In sum, FFRF has failed to allege specific facts necessary to demonstrate standing. "It is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings,' but rather 'must affirmatively appear in the record.'" ***See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)**. Even if there is standing for third-parties, FFRF's proposed Supplemental Complaint has not alleged a realistic possibility that application of the new Policy will suppress a substantial amount of constitutionally protected speech.

### III. DENIAL OF FFRF'S MOTIONS ARE WARRANTED BECAUSE THEY WOULD NOT SURVIVE A DISPOSITIVE MOTION ON THE MERITS.

#### A. The Policy is Constitutional Under Public Forum Analysis.

The proposed Supplemental Complaint would not survive a dispositive motion as a

matter of law. FFRF's right to use government property to display its banner is not unlimited. ***Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 800 (1985)**. The "public forum" analysis was created to recognize that the government must be able to limit the use of its property to the intended purpose for which the property was created, ***see, e.g., Cornelius,* 473 U.S. at 800**, and to limit access to those rightfully conducting business there, ***see, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 53 (1983)**. "The right to use government property for one's private expression depends upon" the nature of that property. ***Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 761 (1995)**.

Once the forum is identified – here, the Courthouse grounds – it must be classified in one of thee ways: a traditional public forum, a designated or limited public forum, or a nonpublic forum. **See *Perry,* 460 U.S. at 44-45**.

In the first, a quintessential public forum, "members of the public retain strong free speech rights." ***Pleasant Grove City, Utah v. Summum*, ___ U.S. ___, 129 S.Ct. 1125, 1132 (2009)**. Still, the government may enforce reasonable time, place, and manner restrictions, or content-based restrictions that are necessary to serve a compelling government interest. *Id.*

FFRF's proposed Supplemental Complaint does not allege that this case involves this type of fora. Nor does it allege that the County's Courthouse Use Policy is a "content-based" regulation. To the contrary, the regulation is content-neutral on its face because it is not a regulation of speech content, but rather is "a regulation of the places where some speech may occur." *Hill v. Colorado,* **530 U.S. 703, 719 (2000)**. A law regulating speech is content neutral if it applies to all speech regardless of the ideas or views expressed. **See *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994)**. The Courthouse Use Policy does not draw distinctions based on content. Rather, the policies and procedures seek to provide "all citizens with equal

access" to the courthouse grounds, which can be used for a multitude of purposes. **See Policy p. 1**. "The decision to issue a permit for use of the courthouse grounds will be made on a nondiscretionary basis and will not be based on the religious or political content of the activity, display, or exhibit." *Id*.

In the second, the government may create a "designated" or "limited" forum, such as a public theater, which is "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Summum,* **129 S.Ct. at 1132**; *Illinois Dunesland Preservation Society v. Illinois DNR*, **2009WL3271194 \*2 (7th Cir. October 14, 2009) (slip op.)**. In limited public forums, the government may impose restrictions on speech as long as they are reasonable and viewpoint neutral. *Good News Club v. Milford Cent. Sch.,* **533 U.S. 98, 106-107 (2001)**. The touchstone for determining whether property is a designated public forum is government intent in establishing and maintaining the property. *Cornelius,* **473 U.S. at 802**.

In the third, the "nonpublic forum," government "may reserve ... for its intended purposes," *Perry,* **460 U.S. at 46**, and over which it has the right to exercise control regarding access. *Cornelius,* **473 U.S. at 806**. Restrictions on speech within a nonpublic forum, such as the Justice Department's auditorium, must be reasonable and viewpoint neutral. *Good News Club***, 533 U.S. at 106-07;** *Illinois Dunesland***, 2009WL3271194 \*3**.

Classifying a courthouse lawn has not yielded bright-line answers. Some courts have found courthouse lawns to be a limited public forum. **See, e.g.,** *Summum v. Callaghan***, 130 F.3d 906 (10th Cir. 1997)**. Others have declared analogous counterparts a designated public forum or even a traditional public forum. **See, e.g.,** *United States v. Gilbert***, 920 F.2d 878, 884 (11th Cir. 1991)** (holding that although a courthouse was a nonpublic forum, the unenclosed courthouse plaza was a designated public forum); *Smith v. County of Albemarle***, 895 F.2d 953,**

**958-959 (4th Cir. 1990)** (collecting cases). Still others have found these locations to be a nonpublic forum. **See, e.g., *Huminski v. Corsones*, 396 F.3d 53 (2nd Cir. 2005)** (courthouse, court lands and courthouse parking lot are nonpublic forums). Seventh Circuit cases provide guidance, but no firm answer. **See *Braun v. Baldwin*, 346 F.3d 761 (7th Cir. 2003)** (lobby of courthouse is not a traditional public forum); ***Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998)** (lobby of the federal courthouse is not a traditional public forum or a designated public forum).

In a recent Seventh Circuit case involving a public park where plaintiffs were denied rack space to place warnings about asbestos, Judge Posner offered helpful guidance for this Court:

> ….Indeed it is rather difficult to see what work "forum analysis" in general does. It is obvious both that every public site of private expression has to be regulated to some extent and that the character of permitted regulation will vary with the differences among the different types of site. Street demonstrations have to be regulated to prevent blocking traffic, and the use of a state theater has to be regulated to ration the use of a limited facility and maintain quality, and obviously the regulations will be very different. The constant (applicable even to nonpublic forums, …) is that regulation is not to be used as a weapon to stifle speech.

**See *Illinois Dunesland*, 2009WL3271194 \*3**. Judge Posner also recognized the practical difficulties in allowing every person to present their views without reasonable limitations:

> …Display racks crammed with brochures and pamphlets are omnipresent in public property in the United States, not only parks and other areas of public recreation but also turnpike service plazas and the lobbies of government buildings. If the plaintiff's conception of freedom of speech prevailed, every clerk responsible for stocking such a display rack would face a potential First Amendment suit by an interest group that wanted to influence government action or public opinion. Must every public display rack exhibit on demand pamphlets advocating nudism, warning that the world will end in 2012 …., reciting the "Seven Aphorisms of Summum" (the title of the plaintiff's monument in the ***Summum*** case), or proclaiming the unconstitutionality of the income tax, together with pamphlets expressing the opposing view on all these subjects? Or ….must the park on request link its online home page to every website of an organization or a person who would like to express an opinion on asbestos fibers or any other topic that might relate to Illinois Beach State Park? We can guess what the effect of the position urged by the plaintiff in this case would be: no more display racks

> on public property; no more home pages for public agencies. **….** We can avoid that end by avoiding this beginning.
>
> It is not as if the denial of rack space had closed off the only good avenue that the plaintiff has for reaching the patrons of the state park with its message. At argument the plaintiff's lawyer, repeating an unelaborated statement in his brief, said his client would need a "demonstration permit" in order to be allowed to hand out pamphlets at the entrances to, or sites within, the park, and implied that such a permit might be difficult to obtain. One of the park officials had told him that applying for such a permit "was a potential avenue for the Dunesland Society to access the park in a way that might be able to get their message out." But he didn't say it was the only way, and the district judge noted that the plaintiff "did not seek to distribute its flyer within the Park by any means other than inclusion in the display racks." The judge added that "no special permit or license is required to hand out pamphlets to Park visitors." The park authorities cannot impose unreasonable barriers to using open public space to convey ideas and opinions (remember that a park is "a traditional public forum"), but there has been no showing that they've tried to do this.

**See *Illinois Dunesland*, 2009WL3271194 \*4-5**.

FFRF's proposed Supplemental Complaint would result in dismissal just like the plaintiffs' case in ***Illinois Dunesland***, regardless of the "forum" characterization. FFRF does not allege that the Policy allows Manitowoc County to deny benefits based on viewpoints. Nor does FFRF allege that that the County's Policy would allow for rejection, denial or dismantling of displays or signs that it disagrees with. FFRF does not allege that the County uses the Policy to draw distinctions based on viewpoints. There are no allegations that the County's Policy has been used to censor FFRF's ideas or that there is a pattern of abuse in favoring certain speakers and disfavoring others under the policy.

The permit procedure is viewpoint-neutral and a reasonable time, place and manner regulation. The policy is viewpoint-neutral on its face. It applies equally to any party seeking to exercise free speech rights on the Courthouse grounds and sets forth only reasonable time, place, and manner considerations to protect the interests of the county government and to prevent interference with the operation of county government. The County reasonably could conclude

that such interests are best addressed by adopting these policies.

### B. The Policy is a Constitutional Time, Place and Manner Regulation.

Proper time, place, or manner restrictions must be narrowly tailored to serve a significant government interest unrelated to the suppression of free expression and leave open alternative channels for communication. *See Ward,* **491 U.S. at**.

Here, FFRF does not allege that alternative channels, like using quintessential public fora like the sidewalks, streets and parks have been closed by the County or are not available. This Policy does not cover those fora.

The County's concerns as expressed in the Resolution and Policy with, *inter alia*, maintaining government operations, appearance and avoiding future litigation have all been upheld by the courts as a significant government interest. The Supreme Court has recognized substantial governmental interests in regulating competing uses of public fora, **see *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130 (1992)**, in maintaining parks in an "attractive and intact condition," **see *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288, 296 (1984)**, in regulating "streets to protect and insure the safety, comfort, or convenience of the public," *Murdock v. Pennsylvania,* **319 U.S. 105, 116 (1943)**, in collecting nominal fees to "defray the expenses of policing" the regulated activity, *id.* **at 113-114**, in advancing aesthetic interests, **see *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805, 807 (1984)**, and in considering the possible large number of groups which may be interested in accessing the site. **See *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 653 (1981)**.

There is another significant government interest here. Because the Supreme Court has emphasized the case-by-case nature of a court's review of an alleged Establishment Clause violation, "[t]he same holds true for efforts to end a violation." *Mercier v. Fraternal Order of*

*Eagles*, **395 F.3d 693, 702 (7th Cir. 2005)** (upholding municipality's effort to sell land and religious monument in response to Establishment Clause violation even if "the City had other options."). **See also** *Pinette*, **515 U.S. at 777** (O'Connor, J., concurring) ("[t]he Clause is more than a narrow prohibition against certain narrowly defined forms of government favoritism ... it also imposes affirmative obligations that may require a state, in some situations, to take steps to avoid being perceived as supporting or endorsing a private religious message."). FFRF is trying to penalize the County – first for not having a policy and now for having a policy. As *Mercier* and *Pinette* point out, the County's efforts to end any perceived violations by enacting this remedy should be afforded some deference as a significant governmental interest.

The Policy is also narrowly tailored, which means that "it need not be the least-restrictive or least-intrusive means of doing so." *Ward,* **491 U.S. at 798** ("the requirement of narrow tailoring is satisfied 'so long as the ... regulation *promotes a substantial government interest that would be achieved less effectively absent the regulation.*' .... [T]he regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.") (emphasis added). In *Schultz v. City of Cumberland,* **228 F.3d 831 (7th Cir. 2000)**, the city required any applicant for a sexually-oriented business license to provide the following disclosures: the applicant's name; proof of applicant's age; the type of license for which the applicant is applying; the proposed location, address and descriptions of the business premises; and identifying personal data. The issue was whether the registration requirements were narrowly tailored. **228 F.3d at 851**. The court held that this information enabled the city to administer and monitor compliance with its zoning requirements and was constitutional. *Id***. at 851-852**. Here, too, FFRF has not alleged any information which shows that the Policy would not survive the narrowly tailored inquiry. In the absence of this

Policy, the County's interests would certainly be achieved less effectively.

### C. The "Unbridled Discretion" Challenge to the Policy is Invalid.

The proposed Supplemental Complaint alleges an unconstitutional prior restraint, but prior restraints are constitutionally legitimate if they are proper time, place, or manner restrictions. *Schultz,* **228 F.3d at 851**. As stated above, the Policy here survives scrutiny as a proper time, place and manner restriction.

FFRF's contention that the policy confers "unbridled discretion" is meritless. On its face, the policy does not vest discretion in the permitting official. Permits will be granted if they are "consistent with the intent and decorum of the seat of government and the appropriate, non-disruptive use of a public facility." To the extent the policy leaves some discretion with officials, this is not a valid reason for ruling it unconstitutional. ***Chicago Observer, Inc. v. City of Chicago,* 929 F.2d 325, 328 (7th Cir. 1991)** (making discretionary decisions is "business of government"). Similar concerns about "unbridled discretion" were rejected in ***Thomas v. Chicago Park District,* 534 U.S. 316 (2002)**, where the Court upheld a licensing requirement for any activity in a public park that exceeded 50 participants. In so doing, it found no "unbridled discretion" for denying permits where the decision-maker considered, *inter alia*, whether "the use or activity intended by the applicant would present an unreasonable danger to the health or safety of the applicant, or other users of the park, of Park District Employees or of the public" or whether "the proposed use or activity is prohibited by or inconsistent with the classifications and uses of the park…" *Id***. at 319 n. 1**. "These grounds are reasonably specific and objective, and do not leave the decision 'to the whim of the administrator.'" *Id***. at 324** (quoted source omitted). "They provide 'narrowly drawn, reasonable and definite standards' to guide the licensor's determination…" *Id*. The Court rejected concerns that the criteria set forth in the ordinance

were insufficiently precise because they were described as grounds on which the Park District "may" deny a permit, rather than on grounds that the decision-maker "must" do so. ***Id*. at 324**. The Court stated that any abuse "must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting on a degree of rigidity that is found in few legal arrangements." ***Id*. at 324-325**. **See also *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)** (upholding guideline requiring city officials to "insure *appropriate* sound quality balanced with respect for nearby residential neighbors....")(emphasis added); (upholding newsstand policy whose guidelines for issuance of permit included, inter alia, "whether the design, materials and color scheme of the newspaper stand comport with and enhance the quality and character of the streetscape, including nearby development and existing land uses").

### D. Specific Objections to the Policy Lack Merit.

Finally, the proposed Supplemental Complaint raises a number of objections about the advance notice, financial and insurance requirements, but those objections would not survive a dispositive motion. "[T]he comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." ***Hill v. Colorado,* 530 U.S. 703, 731 (2000)**.

Fees that cover the administrative expenses of the permit or license are permissible. **See *Cox v. State of New Hampshire,* 312 U.S. 569, 577 (1941)** (approving of a fee "limited to the purpose stated" of meeting "the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed").

The Policy's requirement for 4 week advance notice also passes muster. **See *Thomas,* 534 U.S. 316** (the Court upheld a Chicago ordinance allowing a total of up to 28 days for the Park District to grant or deny a permit application).

The lack of a financial hardship/indigency exception does not lead to constitutional infirmity. **See** *Stonewall Union v. City of Columbus,* **931 F.2d 1130, 1137 (6th Cir.1991)** ("Because we believe the availability of the sidewalks and parks provides a constitutionally acceptable alternative for indigent paraders, we find that the lack of an indigency exception does not render the ordinance constitutionally invalid."). **See also** *Frisby v. Schultz,* **487 U.S. 474, 483-484 (1988)** (an ordinance does not fail for lack of adequate alternatives so long as there are avenues for "the general dissemination of a message"; ban on picketing in public forum upheld where alternatives included entering neighborhoods alone or in groups, going door-to-door, distributing literature through the mails, or contacting residents by telephone).

FFRF's challenge to the insurance and indemnity requirements would also fail. **See** *Thomas v. Chicago Park District,* **227 F.3d 921, 925 (7th Cir. 2000), aff'd on other grounds, 534 U.S. 316 (2002)** (regulation required applicants for permits to obtain liability insurance in the amount of $1 million to indemnify the park); *Urlaub v. Village of Bellport*, **498 F.Supp.2d 614 (E.D.N.Y. 2007)** (upholding insurance and indemnification requirements in parade permitting scheme).

## **CONCLUSION**

For these reasons, Manitowoc County, Bob Zieglebauer and Jeffrey Beyer respectfully request that this Court deny Plaintiff's request to expand this litigation and enlarge the scheduling deadlines and deny the Motions to Modify the Scheduling Order and for Leave to file a Supplemental Complaint.

Dated this 2nd day of November, 2009.

        CRIVELLO CARLSON, S.C.
        Attorneys for Manitowoc County, Bob Zieglebauer and Jeffery Beyer

BY:   s/:Remzy D. Bitar
       RAYMOND J. POLLEN
       State Bar No.: 1000036
       REMZY D. BITAR
       State Bar No.: 1038340
       710 North Plankinton Avenue
       Milwaukee, Wisconsin 53203
       Telephone: 414-271-7722
       Fax: 414-271-4438
       E-mail: rpollen@crivellocarlson.com
              rbitar@crivellocarlson.com

19
Case 1:08-cv-01105-WCG   Filed 11/02/09   Page 19 of 19   Document 45