FREEDOM FROM RELIGION FOUNDATION, INC.,

    Plaintiff,

v.                                                            Case No.: 08-CV-1105

MANITOWOC COUNTY, WISCONSIN
BOB ZIEGELBAUER, Manitowoc County Executive,
And JEFFREY BEYER, Manitowoc County
Public Works Director,

    Defendants.

## REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    Plaintiff Freedom From Religion Foundation ("FFRF"), by its counsel, submits the following Reply Brief in Support of its Motion for Summary Judgment.

**I.    FFRF AS A REPRESENTATIVE ORGANIZATION HAS STANDING TO BRING THIS ACTION BECAUSE A MEMBER HAS SUFFERED DISTINCT AND PALPABLE INJURY THROUGH THE COUNTY'S HOSTING OF THE COURTHOUSE NATIVITY SCENE.**

    FFRF hereby incorporates its arguments regarding standing contained at pages 9-10 of its Brief in Support of Motion for Summary Judgment ("Plaintiff's Brief") and at pages 8-12 of its Brief in Response to Defendants' Motion for Summary Judgment ("Plaintiff's Response"). It is well-established law that organizations such as FFRF have standing to file suit when its members suffered injury that would satisfy standing

requirements if they were to file suit individually.  See Sierra Club v. Franklin County, 546 F.2d 918, 925 (7th Cir. 2008).

Under relevant case law, FFRF member Paul T. Rappel's standing is unquestionable.  As set forth in his declarations, and as he has stated publicly, he is a lifelong resident of Manitowoc County who has been subjected to direct and unwelcome contact with the Courthouse Nativity when it is on display each year, as he must drive past it on his way to and from work.  Furthermore, he has assumed special burdens, such as taking a different route to work, to avoid being forced to view the crèche.[1]  Rappel Dec. 9/23/09 at ¶ 1, 2, 3, 8; Rappel Supplemental Dec. ("Rappel Supp. Dec.") at ¶ 1, 2, 3, 4.

In view of this evidence, defendants' reliance on Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464 (1982) to dispute Rappel's standing is curious, because it plainly holds that a person subjected to unwelcome exposure to religious symbols, *or* who incurs burdens to avoid them, has suffered a cognizable Establishment Clause injury conferring Article III standing.  454 U.S. at 486 n. 22  ("The plaintiffs in Schempp had standing… because impressionable school children were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them.").

Furthermore, with regard to monuments or displays, the Seventh Circuit has specifically held that it is enough to establish standing that direct and unwelcome contact

---

[1] Defendants argue that Rappel's Declaration omits specific details about where Mr. Rappel lives, where he works and what routes he takes to work.  Such detail is unnecessary and courts have found standing on much less. Mr. Rappel has stated, and Defendants do not refute, that he lives in Manitowoc County.  He has further stated, and Defendants do not refute, that he works at a nuclear power plant.  Nevertheless, Mr. Rappel has declared he resides at 6200 Silver Hills Drive in Manitowoc, Wisconsin, and he works at Kewaunee Power Station.  Rappel Supp. Dec. at ¶ 1, 2.  He drives through the City of Manitowoc, past the Manitowoc County Courthouse, on his way to work in Kewaunee.  Id. at ¶ 3, 4.

with a religious display is alleged, without the necessity of showing any "special burden" or altered behavior.  Books v. Elkhart County, 401 F.3d 857, 862 (7th Cir. 2005); See also Books v. City of Elkhart, 235 F.3d 292, 299-301 (7th Cir. 2000); Doe v. County of Montgomery, 41 F3d 1156, 1160-61 (7th Cir. 1994).

Defendants' reliance on Valley Forge for the proposition that Rappel's injury does not confer standing because it allegedly is merely psychological or self-inflicted ignores the fact that plaintiffs in that case were held to lack standing because *they had no direct contact* with the offensive conduct and thus did not present any "personal injury suffered… as a consequence of the alleged constitutional error." 454 U.S. at 485.   In subsequent opinions, the courts have uniformly held that the Valley Forge decision does not mean that "psychological injury" can never be a sufficient basis for the conferral of Article III standing.  Otherwise, none of the plaintiffs in the subsequent cases prohibiting government endorsement of religion would have had standing, including those plaintiffs in the Supreme Court's decisions in County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U.S. 573 (1989) and McCreary County, Kentucky v. ACLU of Kentucky, 545 U.S. 844 (2005).

In fact, defendants have wholly ignored controlling authority and clear precedent, and relied solely upon dissenting opinions in their attempt to dismiss Rappel's injury as a "personal choice" or a self-inflicted injury.[2] Even though Manitowoc County may

---

[2] Defendants also point out that Mr. Rappel is a former Roman Catholic and that he has raised his children Catholic.  They oddly insinuate that Mr. Rappel's former religious beliefs, which mirror those religious beliefs of the groups that erect the Courthouse Nativity each year, somehow lessen the offense.  Any argument that Mr. Rappel lacks standing because he is a former Catholic is like arguing the Jewish plaintiffs in Lee v. Weisman, 505 U.S. 577 (1992), lacked standing to object to the rabbi's prayer at their public high school graduation.  Although his personal views on religion are irrelevant for determining whether Manitowoc County violated the Establishment Clause through the hosting of this Catholic display depicting the birth of Christ, the fact that he is now an atheist actually compounds the offense.  The County's continual hosting of this Christian display on the lawn of the Courthouse grounds for over sixty

question the legitimacy of the "detour approach," it remains the law in this circuit. A plaintiff who has altered his behavior – including taking a different travel route to work – has standing.

Defendants' argument that Rappel's injury is somehow "his own fault" also fails. The Establishment Clause prohibition on government endorsement of religion is mandatory and self-executing; "assumption of the risk" is not a defense, nor is "coming to the injury" a proper basis for objecting to standing. In Buono v. Norton, 212 F.Supp.2d 1202, 1211 (C.D. Ca. 2002), the court rejected the argument that standing is precluded if the plaintiffs "could have avoided the harm." Relying upon the Seventh Circuit approach as a guide, the court reasoned as follows:

> "The government contends that Plaintiffs' exposure to the cross should be disregarded for purposes of standing because Plaintiffs could have avoided the harm. However, the Seventh Circuit has expressly rejected such an argument, and this Court adopts its reasoning. In American Civil Liberties Union v. City of St. Charles, the Seventh Circuit responded to Defendant's contention that 'plaintiffs have inflicted this cost on themselves and can avoid it by continuing to follow their customary routes and shrugging off the presence of the … cross.' The Court held 'that the injury to the Plaintiffs could have been averted … did not deprive the plaintiffs of standing.' **By the government's logic, all individuals offended by a religious display could avoid it and thereby not be harmed by it. Such an argument flies in the face of standing jurisprudence and would render the Establishment Clause a nullity**." Buono, 212 F.Supp.2d at 1211 (internal citations omitted)(emphasis added).

See, also, Books v. City of Elkhart, 235 F.3d 292, 297 (7th Cir. 2000), where the Seventh Circuit also concluded that plaintiffs had standing, even though their injury was based in part on the fact that they "know the [religious symbol] is there, whether [they] see it or not." The fact that they failed to avert their eyes — much like these Defendants'

---

years makes "adherence to a religion relevant… to a person's standing in the political community." Allegheny, 492 U.S. at 593-594. It certainly makes Mr. Rappel into a nonadherent, and sends the message to "nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Lynch v. Donnelly, 465 U.S. 668, 688 (1984).

suggestion that Rappel should simply ignore the Courthouse Nativity or look away — did not defeat standing.

Finally, Defendants' claim that Rappel fails to satisfy prudential standing requirements because he is merely complaining about a generalized grievance such as those shared by every American is specious. His standing is based upon specific injury to himself and, while his "ideological objections" to nativity scenes such as the one at the Manitowoc County Courthouse may be shared by other atheists, non-Christians or even Christians, that does not somehow nullify the injury he has suffered.

Accordingly, standing is conferred on FFRF as a representative organization, at least one of whose members has standing to sue.

**II.    A STAND ALONE NATIVITY SCENE AT AN ENTRANCE TO A CORE GOVERNMENT BUILDING VIOLATES THE ESTABLISHMENT CLAUSE.**

It is odd that Defendants question the use of the endorsement test as the proper analysis for this Nativity Scene case, in view of the fact that its most recent decision directly on point adopted and applied that very test. See Allegheny, 493 U.S. at 592-593 ("[W]e have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence … the prohibition against governmental endorsement of religion 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred.' "). This clear precedent mandates that the endorsement test be applied by this Court with respect to the Courthouse Nativity display at issue here.

While Defendants would prefer this Court to use the "coercion" test in determining whether the Courthouse Nativity is constitutionally permissible, they readily admit that it has not been adopted, especially as the sole test in Establishment Clause cases. In fact, Justice O'Connor specifically rejected this type of analysis for nativity scene disputes:

> "An Establishment Clause standard that prohibits only 'coercive' practices or overt efforts at government proselytization but fails to take account of the numerous more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others, would not … adequately protect the religious liberty or respect the religious diversity of the members of our pluralistic political community. Thus, this Court has never relied on coercion alone as the touchstone of Establishment Clause analysis." Allegheny, 492 U.S. 627-628.

In other cases as well, the Supreme Court has consistently rejected the view that coercion should be the touchstone of an Establishment Clause violation. See Engel v. Vitale, 370 U.S. 421, 430 (1962). To make coercion an essential element of an Establishment Clause violation would make the Free Exercise Clause redundant (see Allegheny, 492 U.S. at 628; see also Abington Sch. Dist. v. Schempp, 374 U.S. 203, 223 (1963)) and would render the Establishment Clause a nullity. Furthermore,

> "Neither the endorsement test nor its application in these cases reflects 'an unjustified hostility toward religion.' Instead, the endorsement standard recognizes that the religious liberty so precious to the citizens who make up our diverse country is protected, not impeded, when government avoids endorsing religion or favoring particular beliefs over others." Allegheny, supra, 492 U.S. at 631 (O'Connor, J., concurring).

Thus, the endorsement test is the only proper analysis for determining the constitutionality of a nativity scene displayed on the grounds of a core government building.

6
Case 1:08-cv-01105-WCG   Filed 12/01/09   Page 6 of 15   Document 49

**A.** **Contrary to Defendants' assertion, the Courthouse Nativity is a stand-alone display, unaccompanied by any other holiday decorations, and as such conveys an unconstitutional message of endorsement.**

Defendants' claim that the Courthouse Nativity is part of a grouping of monuments forming a larger secular display is at best disingenuous and, at worst, a severe distortion of the facts. The temporary placement of the Courthouse Nativity scene on the same grounds as such permanent fixtures as a Fallen Officers Memorial and flagpoles cannot possibly be construed as the same display, and such an argument has been summarily rejected by other federal courts. "The flagpole and war memorials in front of [the Courthouse] are permanent fixtures and not relevant to this analysis." American Civil Liberties Union v. County of Delaware, 726 F.Supp. 184, 190 (S.D. Ohio 1989)(striking down the sole display of a nativity scene on a Courthouse lawn).

Even if these permanent monuments were relevant to the analysis of a nativity scene on the Courthouse grounds, the entirety of the Courthouse grounds is factually dissimilar to the monument display upheld in Van Orden v. Perry, 545 U.S. 677 (2005), where the Supreme Court upheld the permanent display of a Ten Commandments monument on the grounds of the Texas State Capitol. In that case, "22 acres surrounding the Texas State capitol contain 17 monuments, and 21 historical markers commemorating the 'people, ideals, and events that compose Texan identity.' " 545 U.S. at 681. (internal citations omitted). In creating this display, "Texas … treated its Capitol grounds monuments as representing the several strands in the State's political and legal history." Id. at 691. It is simply erroneous to argue that the few monuments and scattered flagpoles and memorial trees present in this case create a context similar to the historical commemoration context present in Texas.

Moreover, the Courthouse Nativity scene does not constitute a portion of a larger seasonal holiday display on the Courthouse grounds because there are none on the northeast corner of the Courthouse lawn. The context in which the Manitowoc Courthouse Nativity scene is situated bears no resemblance whatsoever to the large holiday display upheld in Lynch, where the Supreme Court pointed out that:

> "[T]he Pawtucket display comprises many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads 'SEASONS GREETINGS,' and the crèche." Lynch, 465 U.S. at 671.

Likewise, Defendants conveniently ignore the fact that the menorah display in Allegheny, was part of a larger display that also included a Christmas tree and a sign saluting liberty that read "During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom." Allegheny, 492 U.S. at 635. Notably, the Defendants fail to distinguish why the display with the menorah was constitutional while the sole nativity display also at issue in Allegheny was not. The Defendants even ignore the true context of the Seventh Circuit's decision in Mather v. Village of Mundelein, 864 F.2d 1291, 1292 (7th Cir. 1989), in which the nativity scene was placed along with many other secular holiday decorations such as "lights on trees, wreath and banner, Christmas tree, Santa Claus and sleigh, carolers, snowmen, carriage lights, wreaths and two soldiers in the shape of nutcrackers." The Seventh Circuit in that case stated "Mundelein, like Pawtucket, Rhode Island (the municipality in Lynch), has placed the crèche in the context of other seasonal symbols, showing support for the holiday season rather than for the religion aspect alone." Id.

In this case, there are no other secular holiday decorations accompanying the crèche display during December. There is no banner reading "Seasons Greetings" or banner saluting liberty and freedom. There is no Santa Claus, no reindeer, no candy-striped poles, Christmas tree, carolers, or any other cutout figures representing totally secular figures. There is simply no factual physical resemblance of the solo Courthouse Nativity display to the displays upheld in Lynch or Mather. Mr. Rappel stated, "There would never … be any secular items, like Christmas trees or anything like that. It's always -- only been a crèche so far as I can remember." Ex. A. to Gaylor Dec. 12/1/09, pg. 15, lines 20-23; Ex. A to Bitar Aff., pg. 12, lines 21-24.

Instead, the Courthouse Nativity scene at issue here is virtually indistinguishable from the crèche display held unconstitutional in Allegheny. The Courthouse Nativity sits "unadorned with any secular symbols of the holiday season." Burelle v. City of Nashua, 599 F.Supp. 792, 794 (striking down the sole display of a nativity scene without accompaniment of other secular symbols on the grounds of a city hall). The Defendants strain credulity by weakly arguing that the Courthouse Nativity is part of the other holiday decorations inside the Courthouse during the month of December, such as a Christmas tree inside the County Courthouse lobby, and the City-wide decorations including banners and lights on street lamp posts. Beyer Aff. at ¶ 16. Again, the Defendants cannot argue that the crèche display constitutes a portion of those displays. No reasonable Manitowoc resident would associate the interior holiday decorations of the Courthouse with the exterior Courthouse Nativity display. Certainly, no resident could even see the County Courthouse Lobby Christmas tree when viewing the nativity scene. Despite the Defendants' contentions, passers-by will not see a grouping of holiday

symbols, most of which are secular.  See Mather, 864 F.2d at 1292.  Instead, passers-by in Manitowoc only see the fifteen foot-long crèche, an inherently religious symbol with three to four foot tall figurines depicting the birth of a Christian god with a banner announcing "Christmas Blessings" and "Gloria in Excelsis Deo (Glory to God in the Highest)."[3]  Beyer Aff. at ¶ 10; Zeigelbauer Aff. at ¶ 3.

Just as the crèche display in Alleghany was found unconstitutional so too is the Courthouse Nativity because "[w]hen viewed in its overall context, the crèche display violates the Establishment Clause.  The crèche angel's words endorse a patently Christian message: Glory to God for the birth of Jesus Christ.  Moreover, in contrast to Lynch, nothing in the crèche's setting detracts from that message."  492 U.S. at 602.  The overall context of the Courthouse Nativity display shows that it is a stand-alone nativity scene which only serves to promote a religious message.

### B. A reasonable observer would view the Courthouse Nativity display as County endorsement of Christianity.

A reasonable observer "fully cognizant of the history, ubiquity, and context of the practice in question" would understand the Courthouse Nativity to be government endorsement of religion.  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 40 (2004).  The reasonable observer[4] here would be fully cognizant of the sixty-two year

---

[3] In the Defendants' response brief, they mischaracterize Mr. Rappel's commentary about the nativity scene.  They write, "Mr Rappel stated… that "when you're just driving by, you can't see [the Nativity scene]."  Def. Resp. pg. 2.  However, when reviewing the entire transcript, it is clear that Mr. Rappel was only referring to the words on the banner the crèche's angel is holding, not the fifteen foot-long nativity display itself.  Ex. A to Gaylor Dec. 12/1/09, pg. 8, lines 15-24; Ex. A to Bitar Aff., pg. 6, lines 14-22.  The entire nativity scene is visible to passersby as the picture Mr. Rappel took of the display clearly shows.  Ex. A, B, C to Rappel Dec. 9/23/09.

[4] Defendants ridiculously argue that the reasonable observer would be aware of FFRF's previous litigation efforts involving nativity scenes on public property and state that the reasonable observer "may also know that FFRF sued Green Bay in recent years and that FFRF does not always prevail (and did not prevail in the Green Bay case)."  Defendants continue their deliberate misreading of relevant case law and ignore the reality that FFRF did prevail in Green Bay.  As this Court is well aware, the merits of that case were never addressed because the City of Green Bay wisely halted their unconstitutional behavior.  This Court

10
Case 1:08-cv-01105-WCG   Filed 12/01/09   Page 10 of 15   Document 49

history of the crèche's stand-alone prominent location on the Courthouse lawn. She would be fully aware that Manitowoc County continually allowed the Roman Catholic groups to erect this display without approval or permit and that there were no other seasonal displays surrounding the nativity. Defendants attempt to distract the Court with the absurd notion that FFRF approaches the reasonable observer analysis[5] as "an atheist, a religion in itself, who shows hostility to other religions and seeks to use the Establishment Clause as a sword in the name of atheism to clear the public square of any Christian symbol." Def. Resp., pg. 18. The Plaintiff does not ask this Court to apply a different type of reasonable observer standard other than the one already adopted by federal courts across the country. The Plaintiff notes, however, that the reasonable observer would undoubtedly be also aware that the fastest growing segment of the American population is the non-religious.[6]

The Defendants also try to paint atheism as a religion, whose tenets are hostility toward other religions and a goal to purge Christian symbols from the public square. While some courts have deemed atheism a religion for purposes of the First Amendment, atheism is the lack of belief in a deity; "A" meaning "without"-theism. Nevertheless, the

---

acknowledged in that case that "… *the Plaintiffs have already won.* The Defendants have changed their offending behavior. Practically speaking, the Plaintiffs have won a concrete victory that actually changes the circumstances on the ground. Having obtained a real-life victory, there is nothing to be gained from spending years and thousands of dollars to obtain a piece of paper saying that the Plaintiffs were right." FFRF v. City of Green Bay, 2008 U.S. Dist. LEXIS 80039. (emphasis in original). Undoubtedly then, the reasonable observer, following the Defendants' reasoning, would likely also be aware of the "real-life" victory FFRF obtained in the Green Bay crèche dispute.

[5] Defendants also misquoted FFRF Co-President in their brief. They state, "FFRF's Co-President and Co-Founder, Annie Laurie Gaylor, states that 'the community in Manitowoc must be very, very stupid,' which implicitly (if not explicitly) proclaims that only freethinkers qualify as Justice O'Connor's reasonable person." Def. Resp. Brief, pg. 17. This is an incorrect recitation of Ms. Gaylor's comment on Freethought Radio. Ms. Gaylor never stated that the "community in Manitowoc must be very, very stupid." Gaylor Dec. 12/1/09 at ¶ 4, 5. Rather, the transcript shows that Ms. Gaylor clearly stated "the community in Manitowoc must be very conservative." See Ex. A to Gaylor Dec. 12/1/09, pg. 9, lines 18-20.

[6] See Kosmin, Barry A. and Keysar, Ariela, *American Religious Identification Survey.* http://www.americanreligionsurvey-aris.org/. Last accessed 11/30/09.

Plaintiffs agree that nonbelievers are guaranteed the same freedom of conscience as believers under the First Amendment. This has been the view of the Supreme Court as well,

> "…the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority. At one time it was thought that this right merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism. But when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all." Wallace v. Jaffree, 478 U.S. 38, 51-54.

### C. The Establishment Clause of the First Amendment applies to the nativity scene in this case, just as it has applied to other factually similar crèche displays.

In a last ditch attempt to prove constitutionality of the crèche display, the Defendants next contend that the Establishment Clause was never intended to prohibit the nativity scene display. Def. Resp., pg. 21. This argument is factually and legally erroneous.

First, Defendants continually assert that the crèche was first erected six years before the Supreme Court applied the Establishment Clause to the states. Id. The Defendants mistakenly rely on Zorach v. Clauson, 343 U.S. 306 (1952) for this assertion. They are wrong. The Supreme Court found that the Establishment Clause applied to the states five years earlier in Everson v. Board of Education, 330 U.S. 1 (1947). The Court in that case wrote,

> "The meaning and scope of the First Amendment, preventing establishment of religion or prohibiting the free exercise thereof, in the light of its history and the evils it was designed forever to suppress, have been several times elaborated by the decisions of this Court prior to the application of the First Amendment to the states by the Fourteenth. The broad meaning given the Amendment by these earlier cases has been accepted by this Court in its decisions concerning an individual's religious freedom rendered since the Fourteenth Amendment was interpreted to make the prohibitions of the First applicable to state action

abridging religious freedom. There is every reason to give the same application and broad interpretation to the 'establishment of religion' clause." 330 U.S. at 14-15.

At most, the crèche was only on display one year before the Everson decision. However, as the Everson Court observed, the meaning and the scope of the First Amendment was elaborated by several Supreme Court decisions prior to its formal application through the Fourteenth Amendment. See id.

The actual incorporation date, however, is irrelevant. The Defendants seem to want to "grandfather" in the crèche because it was put up one year before Everson. This "grandfathering" argument fails. It cannot be argued that the subsequent sixty-one year history of an unconstitutional practice should be legal. If the Defendants' arguments were to be true, then those enslaved prior to the Thirteenth Amendment would have remained slaves after its passage, and women who came of age before 1920 when the Nineteenth Amendment was adopted could still be denied the right to vote. Federal courts have never applied basic constitutional rights only prospectively.

Regardless of whether Manitowoc County believes the Establishment Clause applies to this Courthouse Nativity, other federal courts, and the Supreme Court, have applied the Establishment Clause to factually similar nativity scene disputes. To those courts, including the Seventh Circuit, there is no question that the Establishment Clause applies and stand-alone nativity scenes on government property are unconstitutional.

### III. PLAINTIFF HAS RIGHT TO ARGUE CONSTITUTIONALITY OF RECENTLY ENACTED POLICIES AND PROCEDURES GOVERNING THE USE OF THE COURTHOUSE GROUNDS.

Plaintiff's claims against the perpetual and preferential treatment given to the Manitowoc County Catholic Woman's Club and/or Knights of Columbus for the

Courthouse Nativity display should not be waived and they do not lack merit.  Plaintiff incorporates herein Plaintiff's Brief, pg. 19-26.  Contrary to Defendants' assertion, the Plaintiff has presented Manitowoc County's preferential treatment in its complaint.  See Complaint at ¶ 27, 28, 31, 48.  Moreover, Defendants use the "approval" given to these Roman Catholic groups as an affirmative defense.  See Amended Answer and Affirmative Defenses at ¶ 3 (a).  Therefore, Plaintiff has a right to rebut this defense.

Plaintiff also has standing to bring these challenges just as it has standing to bring the Establishment Clause claim.  Plaintiff incorporates herein Plaintiff's Brief, pg. 9-10 and Plaintiff's Response, pg. 8-12.

In lieu of the recently adopted Courthouse Use Policy, which purports to govern displays on the Courthouse exterior grounds, the Plaintiff has moved to supplement its complaint with regard to those policies and procedures.  Therefore, Plaintiff incorporates herein its entire brief in Support of Leave to Supplement the Complaint.  The new procedures, however, do nothing to change the status of the complaint, as they are unconstitutional.  Plaintiff also incorporates herein pages 2-8 of Plaintiff's Response, which address the constitutionality of these new procedures.

Defendants argue that FFRF cannot challenge the County's procedures because FFRF has not applied for and been denied a permit.  Courts have, however, rendered judicial decisions based on facial challenges to statutes, procedures and policies.  Nothing in the case law restricts this Court from issuing a decision to applied challenges only.

Defendants assert there is no evidence that the Courthouse lawn is not open on an equal basis. Plaintiff herein incorporates Plaintiff's Brief, pg. 21-26.  The Courthouse lawn is not open on an equal basis as this case illustrates.  The Manitowoc County

Catholic Woman's Club and/or the Knights of Columbus have never had to abide by any approval process in order to gain access to the lawn. Kratz Dec. Ex. D (Responses to Requests No. 1 and 2). This demonstrates the County's favoritism for Christianity.

Finally, the possibility of viewpoint suppression, especially in this context, is very real in Manitowoc County where one Board member has already publicly stated he would not allow an atheist sign to be displayed. Gaylor Dec. 9/30/09 at ¶ 11, Ex. F. Even under the new policy, which contains no standards, the Public Works Committee could reject any request from FFRF or any other atheist, agnostic or skeptic resident in Manitowoc County to put up a Winter Solstice Display.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court grant summary judgment in favor of the Plaintiff Freedom From Religion Foundation.

Dated this 1st day of December, 2009

/s/ Rebecca S. Kratz
_____

        Rebecca S. Kratz, Staff Attorney
        State Bar No. 1063232
        Freedom From Religion Foundation
        P.O. Box 750
        Madison, WI 53701-0750
        Telephone: (608) 256-8900
        Facsimile: (608) 204-0422
        rkratz@ffrf.org