UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

FREEDOM FROM RELIGION FOUNDATION, INC.,

    Plaintiff,

v.                                                             Case No. 08-C-1105

MANITOWOC COUNTY, et al.,

    Defendants.

---

**DECISION AND ORDER**

---

    Christianity teaches that "God so loved the world, that He gave His only begotten Son, that whoever believes in Him shall not perish, but have eternal life." John 3:16. Christmas, a national and state holiday that falls on December 25th, is the day on which the birth of Christ, who Christians believe is this Son sent by God and others accept as at least a man of great historical significance, is celebrated.[1] Nativity scenes, consisting of figures representing Mary, Joseph and the Christ-child lying in a manger as depicted in the Bible, are traditional symbols of the event the day commemorates. Other, more attenuated symbols of the day, such as figures of Santa Claus, Christmas trees, snowmen, stars, wrapped presents, candles, and even snowflakes have also become common. Every year, these and other symbols of Christmas are displayed in public and private settings during what has come to be called the Christmas holiday season. This case deals with the

---

[1]One indication of Christ's historical significance, so ingrained in our thinking that we seldom take note of it, is the fact that we measure history itself in years from the presumed year of his birth.

recurring question of whether the display on public property of one of those symbols, a Nativity scene or crèche, violates the Establishment Clause of the First Amendment.

Plaintiff Freedom From Religion Foundation, Inc. ("FFRF") brought this action against Manitowoc County, its County Executive and its Public Works Director, alleging that the Defendants violated the Establishment Clause of the First Amendment by allowing the display of a Nativity scene on the lawn of the County courthouse during the Christmas season. While defending its historical practice of allowing the display, the County has since the action was commenced enacted a written policy governing the erection of such displays on the courthouse lawn. For the reasons given below, the Court concludes that the County's recent enactment of a written public display policy has rendered the complaint moot. The Court further concludes that any effort to amend the complaint would be futile. Accordingly, the Defendants' motion for summary judgment will be granted and FFRF's denied.

**I. Background**

Since 1946 the Manitowoc County Catholic Women's Club has annually erected a Nativity scene that depicts the birth of Jesus Christ on the front lawn of the Manitowoc County Courthouse during the Christmas season. (Beyer Aff., ¶ 10.) The display is roughly 10 feet by 15 feet and includes the figures of Mary, Joseph, Jesus, a shepherd, a camel, four lambs, and a blond-haired angel holding a sign with the Latin inscription "Gloria in excelsis Deo" ("Glory to God in the highest"). (Def.'s PFOF ¶ 15.) A larger and more visible sign on top of the display reads, "CHRISTMAS BLESSINGS" and indicates that the display is "Donated by Manitowoc County Catholic Women's Club." (Beyer Aff. ¶ 10.)

The Nativity display is not the only one on courthouse property. The lawn also includes permanent displays honoring veterans and police officers, as well as markers of historical import. Inside the courthouse are the kinds of displays typically found in government buildings: paintings, murals, memorials and other historical and patriotic plaques and flags. During the Christmas season, the County displays a Christmas tree in the courthouse lobby and hangs several red and green banners around the property. The banners contain primarily nonreligious words such as "Santa," "Frosty," and "HoHoHo." Each year in late November the Catholic Women's Club erects the Nativity display on the lawn, which the group also maintains and stores the rest of the year. There are no unveiling ceremonies nor any involvement by County officials.

A few other displays have been allowed on the courthouse lawn, and these (like the Nativity scene) were allowed by County officials under an unwritten, somewhat *ad hoc* policy. For example, the local chapter of the Veterans of Foreign Wars was allowed by the Department of Public Works to house a depository for retired flags, and a fallen officers memorial was approved in 2007.

This system for approving displays (such as it was) changed on September 22, 2009, when the Manitowoc County Board of Supervisors approved a set of courthouse policies and procedures governing use of the courthouse grounds (the "Policy"). The Policy is discussed in some detail below, but by and large its stated purpose is to allow citizens to have their own displays shown on courthouse grounds without respect to the message (religious or otherwise) contained within the display. Following the enactment of the new Policy, FFRF sought leave to amend its complaint to challenge the Policy on First Amendment grounds. Additional facts are set forth below, where relevant.

3

**II. Analysis**

Summary judgment is proper "where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is particularly appropriate when, as here, there are no factual disputes and the questions presented are purely legal ones.

Defendants raise a number of grounds in their motion for summary judgment, but it is clear that this case begins and ends with mootness. Implicit in the "case-or-controversy" requirement of Article III is the principle that "federal courts may not give opinions upon moot questions or abstract propositions." *Worldwide St. Preachers' Fellowship v. Peterson,* 388 F.3d 555, 558 (7th Cir. 2004) (internal quotations omitted); U.S. Const. art III, § 2, c. 1. This means that if a controversy has ended, a court must not wade into the stale debate and issue an injunction or an advisory opinion addressing a problem that is purely theoretical. *Wernsing v. Thompson,* 423 F.3d 732, 745 (7th Cir. 2005).

As noted above, the County recently enacted a written Policy governing the placement of displays on courthouse grounds. Previously, citizens wanting to place a display on the grounds sought permission from the Director of Public Works, and the Public Works Committee reviewed the director's decision. (Beyer Aff., ¶ 19.) (As noted above, this was apparently a rare event.) Now, however, according to the County, the new written Policy is intended to allow all citizens equal access to the courthouse grounds. Because citizens will now have open access, any Nativity scene displayed in the future would be seen not as a government-sponsored message but simply as the message of a citizen group taking advantage of an open forum. This would cure any Establishment Clause violation. And because the only relief sought in the complaint is declaratory

and injunctive relief, the County argues that this case is now moot because there is no chance that the same violations alleged in the complaint will occur in the future.

The resolution approving the Policy noted that the County was currently involved in litigation about its courthouse displays, "and the Public Works Committee believes that it is in the County's interest to adopt written policies and procedures regarding use of the courthouse grounds in order to avoid or minimize the potential for future litigation." (Ziegelbauer Aff., Ex. B, Resolution at 1.) The Policy, which was approved unanimously, provides that display permits will be good for 30 days, without renewal, and such permits will be issued on a first-come, first-served basis. The displays will occupy the northeast quadrant of the courthouse grounds, and each display will comprise up to 200 square feet. "The decision to issue a permit for use of the courthouse grounds will be made on a nondiscretionary basis and will not be based on the religious or political content of the activity, display, or exhibit." (Ziegelbauer Aff., Ex. B, Policy at 1.) The only apparent substantive limitation on displays is that any display must "be consistent with the intent and decorum of the seat of county government and the appropriate, non-disruptive use of a public facility." (*Id.* at 2.) The Policy further indicates that issuance of a permit does not constitute endorsement of any display's message.

The County argues that this new Policy makes it clear that there will not be any endorsement of particular religious displays in the future. Apart from the decorum requirement, which presumably could be met by anyone seeking to display something, there is no discretionary process by which displays are judged. Space is first-come, first-served. Thus, if the Catholic Women's Club Nativity display is seen on the courthouse grounds in the future, all that means is that the Club

5

made a timely application and complied with the Policy's other requirements. There is not even the specter of government endorsement of the group's religious message.

FFRF disagrees, and it seeks leave to amend its complaint to challenge the new Policy as unconstitutional.[2] First, FFRF argues that nothing will change because County officials harbor, and will act on, a bias in favor of Christianity. Regardless of what the Policy says, FFRF contends, the County will favor Christian displays and disfavor any others, and the Establishment Clause violation will continue unabated. Defendants will have "unfettered discretion" in granting permits, and they will likely give groups like the Knights of Columbus and the Catholic Woman's Club "preferential access." (Dkt. 42 at 4.) FFRF also argues that the fact that the permits will be granted on a first-come, first-served basis means that these organizations (who have already had their displays approved in the past) are already, in effect, grandfathered in. In short, FFRF asserts, nothing will change under the new Policy.

FFRF's argument that County officials will apply the Policy in a discriminatory manner is based solely on speculation clouded by an undue suspicion of the County government and its officials. *Wernsing,* 423 F.3d at 435 (finding controversy moot where "possibility of a recurrence remains purely speculative.") It is true that there is a general principle that a defendant's voluntary cessation of complained-of conduct will not moot a case because the defendant usually remains "free to return to his old ways." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632-33 (1953). But "[w]hen the defendants are public officials . . . we place greater stock in their acts of self-correction, so long as they appear genuine." *Federation of Advertising Industry Representatives, Inc. v. City*

---

[2]Although FFRF does not concede that the new Policy moots its original complaint, its argument that the original controversy is still "live" is intertwined with its motion to amend the complaint to challenge the new Policy.

6

*of Chicago,* 326 F.3d 924, 929 (7th Cir. 2003) (quoting *Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir. 1991)). There is no denying that the new Policy specifically forbids discrimination on the basis of religious message, and because the regulation is content neutral it removes any possibility that religious displays could reasonably be viewed as government endorsements of religion. FFRF's argument is premised, essentially, on a belief that the new ordinance is a complete sham: the Defendants *will* discriminate on the basis of religion, FFRF argues, and space for displays will *not* be first-come, first-served but will be slanted to favor displays in line with the Defendants' own religious beliefs.

It should go without saying that making such assumptions is far beyond the role of a federal district court unless there is some kind of history or other reason to call into doubt the statements and (more important) actions of public officials. "Only in cases where there is evidence that the repeal was not genuine has the Court refused to hold the case moot. For instance, in *City of Mesquite v. Aladdin's Castle,* though the City had repealed the challenged ordinance, the Court declined to find the case moot because the City had announced to the Court its intention to reenact the challenged provision if the case was dismissed." *Id.* at 930 (citing 455 U.S. 283, 289 n. 11 (1982)). In other words, federal courts need not – and should not – view the statements of public officials with a jaundiced eye. "To adopt Federation's view that mere repeal is insufficient to moot a case would essentially put this court in the position of presuming that the City has acted in bad faith – harboring hidden motives to reenact the statute after we have dismissed the case – something we ordinarily do not presume." *Id.*

Here, the history suggests that the County did not discriminate even before a formal written policy was adopted. Other non-Christmas-related temporary displays have been allowed on those

7

Case 1:08-cv-01105-WCG   Filed 04/22/10   Page 7 of 14   Document 57

rare occasions when a request was made. (Def.'s PFOF ¶¶ 33-34.) And on the only occasion when permission was requested to set up a competing display over the Christmas season, the Committee of Public Works did not refuse the request but simply asked that a sketch of the proposed display be provided before a decision was made. This occurred in 1993 when a county resident wanted to counter the Nativity display with a "Winter Solstice" display beside it. (FFRF's Response to Def's PFOF ¶ 71.) The resident never provided a sketch and so no final decision was ever made. (Def.'s PFOF ¶¶ 74-76.) This is hardly a history of religious discrimination.

FFRF's further contention that the new Policy will not change anything because the Nativity scene will be grandfathered in is based on a misreading of a statement made by the County's Public Works Director, Jeff Beyer. Beyer noted in his affidavit that the Nativity display had not required annual approvals in the past:

> The Catholic Women's Group sought approval to put a Nativity scene on the Courthouse grounds in 1946. Since there have been no significant changes to the display since the time of the first request, there has been no need for subsequent reviews and approval and the display goes up every year in late November and remains up until sometime in early January. I have not been able to locate any Public Works Committee minutes pertaining to the initial approval for this display.

(Beyer Aff., ¶ 11.)

In discussing the history of the Nativity display, Beyer stated that "there has been no need for subsequent reviews" because the display had not changed since it was approved in 1946. Although it is clear that Beyer was simply discussing what had happened in the past (when there was no policy in effect), FFRF construes Beyer's statement as an official directive that the Women's Club Nativity display will be grandfathered in, *i.e.*, that it will *never* need to seek approval, even under the new Policy. This is an unusual reading of Beyer's statement, however. Beyer was not

8

talking about the new Policy – he was giving historical context and explaining why there had not been any reviews in the past. That is all Beyer's affidavit says. It does not suggest anything about the future application of the new Policy, nor does it even hint, as FFRF asserts, that "Manitowoc County Catholic Woman's Club and the Knights of Columbus do not need to go through the newly enacted permitting scheme." (Dkt. # 42 at 4.) Because there is no reason to think that officials will ignore the new Policy and favor only Christian displays, FFRF's challenge to the Policy on that basis fails.

FFRF also argues, however, that the Policy would be unconstitutional even if County officials actually intend to apply the Policy as it is written. The Policy "lacks any discernible standard" to guide officials in approving display permits, and as such it essentially gives officials unfettered discretion to deny permits for non-Christian messages while favoring Christian messages. But again, the idea that officials will have such wide discretion is based on unfounded suspicion and a deliberate misreading of the Policy itself. The key and overriding standard forbids discrimination on the basis of the content of the proposed display. Although the Policy does not specify particular grounds for which a display permit might be rejected, one can infer that rejections would only occur based on the limitations set forth in the Policy itself. For example, if a proposed display was too large, or if it used profanity or nudity, or if the County ran out of space on its lawn, the Policy would allow its rejection.

FFRF argues that these limitations would still allow rejection based on the secret religious preferences of County officials, but again that is wholly speculative. *Every* restriction ever drafted could be misapplied by a government official bent on thwarting opposing viewpoints, and a suspicious applicant could always say that the official's stated reason for the rejection was

9

pretextual. That is not how constitutional challenges work, however: we do not sit back and envision the worst-case scenario and assume government actors are waiting in the shadows for the first opportunity to violate the Constitution and ignore their own newly approved policies and procedures. In short, FFRF's speculation that the Policy will be ignored is not grounds for finding that the Policy itself is unconstitutional. The proposed amended complaint's challenge to the new Policy would thus be futile.

Finally, FFRF also raises what appears to be a free expression challenge in which it asserts that the County's Policy is too broad and would suppress too much speech. FFRF is correct that courts have sometimes struck down content-neutral policies if they allow *carte blanche* authority to officials with no guide as to how the policy should be applied: "Of course even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas v. Chicago Park Dist.,* 534 U.S. 316, 323 (2002). In *Thomas,* the regulation provided specific grounds upon which a permit could be denied, and the Court found that "[t]hese grounds are reasonably specific and objective, and do not leave the decision 'to the whim of the administrator.'" *Id.* at 324. The key requirement is that the regulation or policy must have "adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.* at 323.

But of course *Thomas* was a free speech case addressing government suppression of speech. The present case is, or was, an Establishment Clause case. FFRF's standing to bring this lawsuit is based upon the umbrage taken by one of its resident-members about the County's allowance of a Christian-themed display on its property. "The requisite elements of Article III standing are well

10

established: 'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Hein v. Freedom From Religion Foundation, Inc.,* 551 U.S. 587, 598 (2007) (quoting *Allen v. Wright,* 468 U.S. 737, 751 (1984)). Based on the injury to its member, FFRF has standing (*if* it has standing) to bring an Establishment Clause challenge, but that does not mean FFRF has standing to challenge the Policy in a fashion that is wholly unrelated to any injury suffered by its members. Nowhere in the proposed amended complaint is there any suggestion that FFRF or its members want to display or say *anything* at the courthouse. No member of FFRF has applied for a permit and been denied (or even *wants* to apply for a permit). After all, the relief FFRF wants is negative, namely, to ensure that the County does *not* allow the display of certain images (hence its name Freedom *From* Religion). FFRF has alleged no impingement on its speech resulting from the new Policy, and thus there is no "personal injury fairly traceable to the defendant's allegedly unlawful conduct." *Id.*

> [T]he question reduces to whether the plaintiff has been injured within the meaning of Article III. Here, that inquiry is informed by what the plaintiff does not assert. She does not assert that she herself unsuccessfully attempted to place her handiwork on the south lawn of City Hall. She does not assert that she has any interest in erecting a display, but fears that her expression will be subjugated to a standardless approval process. She does not assert that the Policy takes away her appetite for expressing herself or chills her speech in any cognizable way. Her only claim of injury is that, as a resident and taxpayer, she is subject to the effects of the Policy and that, by conferring unbridled discretion on the mayor to approve or reject displays, the Policy has a chilling effect on the speech of others.

*Osediacz v. City of Cranston,* 414 F.3d 136, 141-42 (1st Cir. 2005) (reversing judgment for lack of standing).

As FFRF seeks to do here, the plaintiff in *Osediacz* presented both an Establishment Clause claim and a free speech claim. The First Circuit made clear, however, that even though she may

11

have had standing to bring her Establishment Clause claim, that did not translate into standing to bring the speech claim:

> We reject this effort to hitch the plaintiff's First Amendment claim to her defunct Establishment Clause claim. Simply asserting that the mayor might exercise his authority in an unconstitutional manner is no different than saying that the existence of standardless discretion is itself unconstitutional and redressable without regard to the existence of an injury in fact. Any way the pie is sliced, the plaintiff still has to show some reasonable possibility that she would be subject to the constitutionally defective action.

*Id.* at 143. The same conclusion follows here. FFRF lacks standing to challenge the policy on free speech grounds.

Because enactment of the new Policy renders moot the controversy alleged in the original complaint, the complaint will be dismissed. And because the new Policy does not violate the Establishment Clause and because FFRF lacks standing to bring any other challenge to the Policy, FFRF's proposed amended complaint would be futile. The motion to amend will therefore be denied.

**III. Conclusion**

For the reasons set forth above, the Court concludes that FFRF's effort to ban the Manitowoc County Catholic Women's Club Nativity scene from the courthouse lawn fails, at least for now. By adopting a written Policy transforming a portion of the courthouse lawn into a public forum open to any and all displays "consistent with the decorum due the seat of county government and with the appropriate, nondisruptive use of public property" (Ziegelbauer Aff., Ex. B at 6), the County has effectively rendered FFRF's case against the defendants moot. Like the City of Cranston in *Osediacz*, however, the County may come to regret its solution to the problem. After

12

the City in that case designated the south lawn of City Hall as a limited public forum for the display of holiday-themed and seasonal decorations, it was treated to not only a large menorah accompanied by a sign conveying wishes for "a Happy Chanukah" and a near-life-size nativity scene, but also "an inflatable seven-foot-tall snowman and a similarly sized Santa Claus; a huge holographic angel; a train of fifteen pink flamingos with Santa Claus hats; and a sign that read 'Happy Holidays from the Teamsters Union.'" 414 F.3d at 138. "Faced with this embarrassment of riches, the City determined . . . . that the south lawn could contain nothing more and barred further entries." *Id.* The County may find itself deluged with applications seeking to enrich the holiday season with similar displays.

Thus, it seems local governmental bodies that permit Nativity displays on government property as symbols of the Christmas holiday must choose between two alternatives. They can either surround the crèche with the more anodyne symbols of the Christmas holiday having no recognizable connection to the event the day commemorates *see County of Allegheny v. ACLU*, 492 U.S. 573, 598-600 (1989) (holding that whether crèche display violates Establishment Clause depends on degree to which surrounding secular symbols are sufficient to diminish its religious meaning), or open up their public spaces to a cacophony of silliness inspired by either bad taste or a desire to drown out or counter any possible religious message. *Osediacz*, *supra*. This hardly seems reasonable. As Judge Easterbrook observed in addressing this issue more than fifteen years ago in *Mather v. Village of Mundelein*, "[i]f Christmas may be a holiday-that is, if states may celebrate the birth of Jesus Christ-it is difficult to condemn the government's display of a nativity scene together with the other symbols of the day. The crèche depicts the event that the day commemorates. That this symbol has religious meaning is obvious, but once we admit the holiday

13

(mounted at great expense in holiday pay for all civil servants), the display of symbols pales." 864 F.2d 1291, 1298 (7th Cir. 1989) (Easterbrook, J., concurring). Judge Easterbrook continued:

> Governments display the appropriate symbols for other occasions; the holiday celebrating the life of Rev. Martin Luther King, Jr., brings readings from his sermons, unabashedly sectarian in nature. When the government speaks but does not compel others to worship or penalize those with different views, there is no serious threat to religious freedoms.

*Id.*

Judge Easterbrook's views on the issue, however, have not been adopted by the Supreme Court. Instead, the Supreme Court's own decisions on the issue have created so much uncertainty that the only sure answer is the one that eventually results from costly litigation. *See County of Allegheny*, 492 U.S. at 675 ("This test could provide workable guidance to the lower courts, if ever, only after this Court has decided a long series of holiday display cases, using little more than intuition and a tape measure.") (Kennedy, J., dissenting). And so the annual "Christmas wars" that have become so much a part of the American holiday tradition will continue as one of several fronts in the much wider cultural debate over the role of religion in our nation's history and its well-being, and the degree to which government may constitutionally recognize that role. For the reasons set forth above, however, this particular battle in that war has been rendered moot.

The Defendants' motion for summary judgment is **GRANTED**. The Plaintiff's motion to amend and its motion for summary judgment are **DENIED**. The case is **DISMISSED**. The Clerk is directed to enter judgment in favor of the Defendants.

Dated this   22nd   day of April, 2010.

                                         s/ William C. Griesbach
                                         William C. Griesbach
                                         United States District Judge